UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

PAULA K.[1],                                    )
                                                )
          Plaintiff,                            )
                                                )
     v.                                         )     CIVIL NO. 1:20cv318
                                                )
ANDREW M. SAUL,                                 )
Commissioner of Social Security,                )
                                                )
          Defendant.                            )

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits under Title II of the Social Security Act. Section 205(g) of the Act provides,

inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript

of the record including the evidence upon which the findings and decision complained of are

based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since August 18, 2014, the alleged onset date (20 CFR 404.1571 et seq.).

3.  The claimant has the following severe impairments: lumbar degenerative disc disease with history of L5-S1 fusion, Ehlers-Danlos syndrome, cervical degenerative disc disease, carpal tunnel syndrome, generalized anxiety disorder, depression, and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; should avoid working on wet and slippery surfaces, should avoid work within close proximity to open and exposed heights and dangerous machinery such as open flames and fast moving exposed blades; should avoid work involving concentrated exposure to vibration; could perform frequent handling and fingering; could perform frequent overhead reaching; could perform simple, routine, and repetitive tasks that can be learned through short demonstration and up to 30 days; can maintain attention and concentration for two-hour segments; can remember simple work-like procedures; can make simple work-related decisions; limited to work requiring only occasional decision-making and only occasional changes in the workplace; can tolerate predictable changes in the work environment; can meet production requirements in an environment that allows a flexible and goal oriented pace; is limited from fast paced work such as assembly line production work with strict or rigid productivity requirements; could have frequent interactions with supervisors apart from what is necessary for general instruction, task completion, or training; could have frequent interactions with coworkers and the general public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on March 11, 1965 and was 49 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 18, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13 -23).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on April 27, 2021. On June 8, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on June 22, 2021. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is

> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature

of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff was born in March 1965, has a high school education, and was considered a

"younger" person as of her alleged onset date; she switched age categories to "closely

approaching advanced" age in March 2015. (AR 41, 107). As of the date of the ALJ decision,

Plaintiff was less than five months from changing age categories to "advanced age". (AR 22,

107).  Plaintiff is currently 56 years old, putting her in the "advanced age" category (55 and over).

The vocational witness who testified at the hearing classified Plaintiff's past work as a CNC

machinist, which according to the Dictionary of Occupational Titles (DOT) is skilled work and

medium in exertion. (AR 67).

Plaintiff appeared with her attorney and testified at the ALJ hearing (AR 34-76). She

reported that she had worked as a CNC machinist at Trelleborg for 27 years, and in that job she

had to lift between 50 to 100 pounds. (AR 42). The job ended because "[her] brain wasn't

working right and [her] back couldn't handle it." (AR 42). On the last day she went to work, she

had to be "wheeled out in a chair because [her] back hurt so severe [she] couldn't walk. (AR 42).

When the ALJ asked Plaintiff why she could not work, she responded that she could not

remember daily activity things, needed to write things down, and would forget if she did not do

something right away. (AR 43). She also had back and feet problems that limited her and caused

pain even after undergoing surgeries. (AR 43). Her back surgery "lasted for two, three years" but after that her back started to get bad again. (AR 44). She felt her memory problems started while she was still working; she noted she was having problems doing her job and had to ask for help a lot. (AR 43). She responded that her doctors indicated the memory problems could be due to the depression or because of her medication, but she was afraid to adjust her medications because she took so many. (AR 43).

Plaintiff testified that her condition caused "good days" and "bad days." (AR 54). She estimated the percentage of good/bad days, as three good days and four bad days. (AR 63). On good days she could get housework done little by little with "not that much pain, probably about a level five". (AR 54). On bad days, her pain reached anywhere from an eight to a ten, and she would sit, stand, walk, pace, lie down, or do whatever it takes to get the pain to stop. (AR 54-55). Showering was difficult because it felt like a "thousand needles" were being thrown at her, and the standing was difficult due to her feet. (AR 46). She needed to sit down to shave her legs. (AR 46). It was easier not to take a shower on "bad days," and at times she went two or three days without a shower because she dreaded it. (AR 46-47). For the most part she did not have problems getting dressed. (AR 47).

Walking or sitting too long aggravated the pain and standing in one place was a "major no-no". (AR 55). She felt she could walk better than stand and testified that standing was "not an option" because it caused back pain, followed by leg pain that was mostly on the right but also on the left on a few occasions. (AR 55). She paced and moved when standing. (AR 60-61). Her previous back surgery was on the last vertebrae at her tailbone, and she felt like she was sitting on a rock when she was sitting. (AR 56). Usually lying down for an hour or so helped ease the pain

and getting "back into things" aggravated the pain again. (AR 55).

Plaintiff testified that she did not have much current treatment because she could not afford it. (AR 44-45). She had participated in physical therapy after her back surgery but two to three years after the surgery her back pain returned. (AR 44-45). She had also undergone surgery on her feet for plantar fasciitis, but the problems with her feet returned after the surgeries. (AR 45). She was told there was nothing more that could be done, and she needed to modify how long she was on her feet to keep it under control. (AR 45).

Plaintiff testified that she had anxiety attacks every day and sometimes several times per day. (AR 48-49). She took medication for her anxiety that helped in the sense that she did not have the attacks as frequently. (AR 49). Her psychiatrist's office had recently increased her anti-psych med, Loxapine, but she was not noticing a difference. (AR 56). She had gone to counseling in the past that was helpful and got in touch with her sister who was "like [her] therapist" and talked to her on the phone about three times a week. (AR 49-50). Anxiety made it hard to focus and concentrate because her attention span was "not there". (AR 63).

During a typical day it took her at least two hours to wake because she took medications to help her sleep, and it took a while for some of them to wear off. (AR 46). Once awake, she started to do housework "little by little". (AR 46). She liked to quilt but could only do it briefly because looking down to quilt or look at a book or computer aggravated her neck and caused a burning sensation across the shoulders (AR 46). She indicated that she did not watch TV and could not focus well enough to read. (AR 49-50). Plaintiff reported that she used to read all the time and would pick up books at garage sales and the library but had stopped reading before she lost her job. (AR 50-51). She described herself as a "shell of a person" and for about six months

before her work ended, she was noticing she could not make "simple edits" and needed other people to help make edits in the computer even though she had done that for many years. (AR 51). She thought she was having the problems due to stress, depression, PTSD and "all that". (AR 51-52).

Plaintiff could do things like weeding the flower bed for five or ten minutes and then needed to go back in the house because of the pain. (AR 44). It took "forever" to get household chores and things around the house completed. (AR 44). She could not carry the laundry up and down stairs but otherwise did most of the household chores and "work[ed] in spurts" of 15 minutes to a half hour, depending on what she was doing. (AR 44). She could cook but mostly made "fast meals"; if she made a "big meal," she needed to stay in the kitchen or she would burn the food. (AR 46). She took breaks ranging from 15 minutes to a half an hour and was usually sitting in a recliner. (AR 61-62).

Plaintiff could drive but did not do so often and stayed within about a five mile "comfort zone". (AR 53). Driving longer distances caused anxiety and panic if she got lost. (AR 53-54). Her husband played in a band, and sometimes he took Plaintiff along to watch, which was about twice a month. (AR 47, 60). To get her out of the house, he would tell her he was going to get her Starbucks, but then he wouldn't take her back home. (AR 47, 60).

Sometimes her daughter and granddaughters came to visit; on occasion she babysat her grandchildren in a pinch, but her husband was usually there to help, especially when Plaintiff started to get stressed. (AR 47-48, 52). The week prior to the hearing, Plaintiff decided to watch the children by herself which was a mistake because she ended up yelling and screaming at them and had a "nervous breakdown" and was in tears by the time her daughter returned. (AR 47).

Plaintiff reported that she got upset "quite a bit" and that arguments and disagreements caused her "really bad anxiety". (AR 48). She described a "nervous breakdown" as having really high anxiety, starting to pace, inability to focus, and getting "wrapped up" in a situation and feeling like she could not get out. (AR 48-49).

In support of remand, Plaintiff first argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in evaluating Plaintiff's fibromyalgia. The ALJ considered Plaintiff's impairments at step two of the sequential evaluation process and noted that she "alleged" fibromyalgia. (AR 14). Not only did the ALJ conclude Plaintiff's fibromyalgia was not a severe impairment, but she found that it did not even qualify as a "medically determinable impairment." *See* 20 C.F.R. 404.1521. The ALJ asserted that "the record is absent of a physician's diagnosis of this condition using the criteria described in SSR 12-2p, specifically, identification of at least 11 positive tender points or the exclusion of other disorders that could cause symptoms including the following: fatigue, widespread pain, memory problems, waking unrefreshed, depression, and anxiety." (AR 14).

Social Security Ruling 12-2p contains SSA's policy and guidance for evaluating fibromyalgia. The ruling describes fibromyalgia as a "complex medical condition" and notes that SSA must "properly consider a person's symptoms" in deciding whether a person has a medically determinable impairment of fibromyalgia. The ruling describes the evidence needed to establish that fibromyalgia is a medically determinable impairment, including documentation that a physician reviewed the person's medical history and conducted a physical exam. SSR 12-2p states that SSA will find that a person has a medically determinable impairment of fibromyalgia if the physician diagnosed fibromyalgia, provides evidence satisfying the 1990 or 2010 American

College of Rheumatology (ACR) criteria, and the diagnosis is not "inconsistent with the other evidence in the person's case record." *See* SSR 12-2p.

Both the 1990 and the 2010 ACR criteria require documentation of a history of widespread pain. SSR 12-2p II.A.1., II.B.1. The ALJ did not identify this as a criterion that was lacking, and there is ample support in the record for the type of widespread pain required. (AR 357, 359-360, 375-369, 374,435- 436, 526-529, 799-804). It appears the ALJ thought the record did not support the requisite number of tender points under the 1990 ACR criteria or, alternatively, exclusion of other disorders that could cause Plaintiff's symptoms under the 2010 ACR criteria. *See* SSR 12-2p II.A.2, II.B.3.

The 1990 ACR criteria require at least 11 out of the 18 positive tender points sites on physical exam found bilaterally and both above and below the waist. Plaintiff argues that a review of the diagnostic tender point sites and evidence in Plaintiff's record strongly suggests that she had the requisite number of sites. (AR 358, 360, 374).

In her unfavorable decision the ALJ never mentioned the evidence within Dr. Kaplansky's records demonstrating the presence of tender points, examination findings, and symptoms supporting the fibromyalgia diagnosis. (AR 356-379). Instead, the ALJ mentioned evidence from Dr. Kaplansky tending to favor non-disability, including that Plaintiff had a history of lumbar fusion and instrumentation surgery, but her surgeon did not recommend additional surgery. (AR 18). The ALJ also referenced diagnostic imaging of the spine that Dr. Kaplansky ordered and implied it was benign. (AR 19). Plaintiff contends that this is an impermissible approach to evaluating the evidence of disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (An ALJ cannot "cherry-pick" facts that support a finding of nondisability while ignoring evidence

that points to a disability finding.).

In contrast to the 1990 ACR criteria, the 2010 ACR diagnostic criteria do not require documentation of a certain number of tender points, but instead require a history of widespread pain along with repeated manifestation of six or more fibromyalgia symptoms, signs, and co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome. *See* SSR 12-2p. II.B. Other pertinent diagnostic somatic symptoms include muscle pain, tiredness, "thinking or remembering problems," muscle weakness, numbness or tingling, insomnia, dry mouth, loss of appetite, ringing in the ears, and frequent urination. SSR 12-2p fn 9. The type of "objective evidence" to establish fibromyalgia is quite different than for other types of impairments, and SSR 12-2p states that "somatic symptoms" for establishing fibromyalgia are considered diagnostic "signs" under 20 C.F.R. 404.1528(b). A doctor's clinical findings that an individual meets the guidelines for fibromyalgia qualifies as "objective" evidence. *Id.*

Plaintiff argues that the record in this case also contains evidence documenting the requisite findings to establish that fibromyalgia is a medically determinable impairment under the 2010 ACR criteria with widespread pain as well as manifestations of six or more fibromyalgia symptoms. In July 2014 Plaintiff presented to Bryan Kaplanksy, M.D. at Musculoskeletal Institute of Community Memorial Hospital regarding back pain and fibromyalgia. (AR 356). She was referred by "Cheryl" at Integrity Physical Therapy (PT) for consultation due to "all over body pain with constant pain that varied in intensity". (AR 357). Her symptoms were mainly to the back, ribs, bilateral legs, and neck. (AR 357, 374-379). She described a stabbing pain across the back that radiated to the lower ribs, an achy pain in her lower back, a burning sensation and numbness

in her neck, cramping to bilateral begs and an aching, cramping to the bilateral feet, and a stabbing pain to the right wrist. (AR 357). Dr. Kaplansky's exam was positive for diffuse four-quadrant and symmetric paraspinal tenderness. (AR 358). Dr. Kaplanksy ordered diagnostic imaging, provided an "off work note," and recommended a follow-up visit. (AR 356).

Plaintiff returned to Dr. Kaplansky in August 2014, and her symptoms remained unchanged. (AR 359-360, 364-367). The physical exam again demonstrated four quadrant and paraspinal muscle tenderness as before. (AR 360). Dr. Kaplansky also reviewed the diagnostic imaging, assessed fibromyalgia, and recommended acupuncture. (AR 359). Plaintiff returned on September 17, 2014 for her first acupuncture appointment and rated her pain as an 8 on a 0-10 scale. (AR 362). Dr. Kaplansky's physical examination noted that Plaintiff looked well, had a normal gait, and had the "usual muscle tenderness". (AR 363). At that visit he referred Plaintiff to Parkview Behavioral Health for a same-day appointment because of her depression. (AR 362-363). On September 22, 2014 Plaintiff was a "no show" for an acupuncture appointment because it was not helpful; Dr. Kaplansky referred her back to her primary care doctor due to her "very complicated history". (AR 368).

In October 2014, Plaintiff presented to Mark Dickmeyer, M.D. at Parkview to establish care. (AR 728). His exam was positive for multiple trigger points in the right scapular area and paralumbar area bilaterally. (AR 730). Dr. Dickmeyer's diagnosis included fibromyalgia as well as depressive disorder, and cervical radiculopathy. (AR 730).

A January 2016 consultation with Andrea Haller, M.D. from Fort Wayne Neurological Center contains multiple findings and somatic symptoms which document at least six or more manifestations of fibromyalgia symptoms or co-occurring conditions consistent with the 2010

ACR diagnostic criteria. *See* Social Security Ruling (SSR) 12-2p II.B.2. Dr. Haller noted that Plaintiff was referred for a variety of symptoms including muscle pain, twitching, and tingling, tingling sensations in her hands and arms for years that wake her up at night and involve her arms bilaterally, pain in her right hip radiating into the right groin (which she was told was not related to her spine), difficulty with her sleep, morning headaches, excessive daytime sleepiness, poor quality sleep, lack of energy during the day, both difficulty falling asleep and waking from sleep, daytime hypersomnolence, and nocturia (frequent urination at night) (5 times nightly), poor concentration and attention, memory loss, word finding difficulty, tinnitus (ringing in the ears), and muscle pain among other extensive difficulties. (AR 799-800). Dr. Haller diagnosed chronic pain from multiple causes. (AR 803).

Medical records from Parkview Psychiatric Care, and nurse practitioner Sara Glassley at Exhibits 6F, 12F, and 15F, reflect not only a diagnosis of fibromyalgia but also contain evidence of the diagnostic somatic symptoms and co-occurring conditions described in SSR 12-2p. These include for example co-occurring depression and anxiety and somatic symptoms including memory disturbance, sleep difficulties, and appetite decrease. (AR 607-609, 668-670, 692, 847-850, 854, 996-997,1022-1023).

Stephen Parker, M.D., a physician hired by the Indiana DDB to exam Plaintiff, also reported fibromyalgia as a diagnosis following an examination. (AR 843). His examination includes documentation of relevant somatic symptoms, including numbness/tingling, depression, anxiety, memory loss, loss of appetite, fatigue, tinnitus, dizziness, chest pain, and diarrhea. (AR 834).

Despite the abundance of evidence supporting the fibromyalgia diagnosis, the ALJ

concluded the condition was not a medically determinable impairment because other disorders that could cause Plaintiff's symptoms, including fatigue, widespread pain, memory problems, waking unrefreshed, depression, and anxiety, were not excluded. (AR 14). The exclusion requirement in SSR 12-2p points to the need to "rule out other disorders that could account for the person's symptoms and signs." SSR 12-2p, II.A.3, II.B.3. Testing to rule out other disorders may include imaging and laboratory tests. *Id*. Plaintiff argues that, in the present case, Dr. Kaplansky took the necessary steps to confirm the fibromyalgia diagnosis consistent with the ACR criteria. Not only did Dr. Kaplansky take a pertinent history, but he also performed a physical examination and ordered imaging. After undergoing the testing, Plaintiff returned to Dr. Kaplansky in August 2014, and he reconfirmed the diagnosis of fibromyalgia after reviewing the results of the testing. (AR 359-360, 364-367). The ALJ also cited "objective evidence," including diagnostic imaging, normal reflexes, grossly intact sensation, and full range of motion in the lower extremities as inconsistent with Plaintiff's symptoms. (AR 18). Plaintiff contends that the "objective evidence" the ALJ cited tends to support "ruling out" other causes for Plaintiff's subjective symptoms under the ACR criteria. *See* SSR 12-2p.

Plaintiff also contends that the ALJ's demand for the exclusion of other disorders is a more stringent standard than the one suggested by SSR 12-2p. *See Swales v. Saul*, No. 19-36107, 2021 U.S. App. LEXIS 8593, at *2 (9th Cir. Mar. 24, 2021). As the Court recognized in *Swales*, SSR 12-2p does not require fibromyalgia to be a "stand-alone" impairment. *Id*. Multiple Circuits have found that other co-occurring medically determinable impairments exist with fibromyalgia, including, *e.g.*, degenerative disc disease, depression, and obesity. *Swales*, 2021 U.S. App. LEXIS 8593, at *2 (citing *e.g., Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017)) (arthritis, obesity,

fibromyalgia); *Romero v. Colvin*, 563 F. App'x 618, 619 (10th Cir. 2014) (degenerative disc disease, depression, obesity, fibromyalgia); *Arakas v. Comm'r*, 983 F.3d 83, 94 (4th Cir. 2020) (degenerative disc disease and fibromyalgia). As Plaintiff notes, even a prior ALJ decision in Plaintiff's record indicates that fibromyalgia was a severe impairment along with other co-occurring, severe impairments. (AR 83).

Plaintiff notes that if the ALJ had doubts about the diagnosis, she could have taken additional steps to resolve the insufficiencies that she perceived. SSR 12-2p contains a section telling adjudicators what steps to take when there is insufficient evidence to determine whether a person has a "MDI [Medically Determinable Impairment] of FM [Fibromyalgia] or is disabled." SSR 12-2p. III.C. Plaintiff argues that the ALJ took none of these additional steps before reaching her own lay, independent conclusion despite overwhelming and consistent evidence to the contrary, including evidence from SSA's own examining physician who also diagnosed fibromyalgia (AR 843). Plaintiff argues that this is an impermissible instance of "playing doctor." *See, e.g., Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) (warning that an ALJ may not "play[] doctor and reach[] his own independent medical conclusion").

In response, the Commissioner argues that "[e]ven if the ALJ should have listed fibromyalgia as a severe impairment at step two, the ALJ considered all of Plaintiff's impairments that the record supported." The Commissioner urges the Court to be unconcerned about the ALJ's allegedly "harmless error" in failing to properly evaluate Plaintiff's fibromyalgia because "the ALJ considered the combined effects of Plaintiff's medically determinable impairments on [Plaintiff's] RFC." However, the Commissioner has not explained how the ALJ could have accounted for the combined effects of Plaintiff's "medically determinable impairments" when the

ALJ erroneously concluded that an impairment central to Plaintiff's claim of disability, *i.e.*, fibromyalgia, did not even qualify as a "medically determinable impairment."  Additionally, the Commissioner has failed to refute Plaintiff's argument that the ALJ's consideration of the evidence, including the findings and symptoms related to fibromyalgia, was characterized by improper cherry-picking of the record with the ALJ overlooking the evidence favoring Plaintiff's disability claim.

Contrary to the Commissioner's assertion, Plaintiff identified evidence in the record, including her symptom reports and medical opinion evidence, supporting her disability claim and a more restrictive physical and mental RFC. Because of the ALJ's errors, she failed to properly evaluate the symptoms associated with Plaintiff's fibromyalgia and co-occurring impairments. Thus, the ALJ's symptom evaluation was not supported by substantial evidence, and this court cannot be assured that the ALJ crafted an RFC assessment incorporating all of Plaintiff's limitations. Accordingly, remand is required on this issue.

Next, Plaintiff argues that the ALJ erred in evaluating the symptom testimony resulting in an unsupported RFC assessment. An ALJ's symptom evaluation is reviewed for legal error and will be reversed if, overall, the ALJ's factual conclusions are "patently wrong." *See, e.g., Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). An ALJ's assessment is "patently wrong" when the findings lack adequate explanation or are not "competently" explained, are not supported by substantial evidence from the record as a whole, or are otherwise factually or logically mistaken. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006); *see also Cullinan*, 878 F.3d at 604 (credibility determination lacks support when it relies on inferences that are not logically based on specific findings and

evidence). *See also* 42 U.S.C. § 405(g) (findings of fact conclusive when supported by substantial evidence); 20 C.F.R. § 404.1529; SSR 16-3p. To permit the reviewing court to determine whether the decision is legally sound and factually supported, the ALJ must support his or her finding with specific reasons, supported by substantial evidence, and explained well enough for a reviewing court to conduct a thorough review. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)); Social Security Ruling (SSR) 16-3p.

Plaintiff argues that in discrediting Plaintiff's reports regarding her symptoms, the ALJ relied on unsupported, illogical assumptions about the absence of "objective" medical evidence and the type of treatment that would be expected. As discussed above, Plaintiff contends that she has a long list of somatic symptoms that are diagnostic of fibromyalgia, yet the ALJ incorrectly focused on "objective evidence" that have no bearing on the severity of Plaintiff's fibromyalgia symptoms. (AR 18-19). According to Plaintiff, these findings have little bearing on the severity of Plaintiff's fibromyalgia symptoms and are not valid reasons to discount Plaintiff's reports about the intensity and persistence of her symptoms. *See, e.g., Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

The Seventh Circuit has explicitly recognized that the causes of fibromyalgia are unclear and diagnostic tools are lacking, yet an ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical testimony supporting it. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017); *see also Charidy T. v. Saul*,

1:20-cv-106-JVB, 2021 U.S. Dist. LEXIS 77136, at *5-11, 2021 WL 1573942 (N.D. Ind. Mar. 22, 2021) ("A lack of objective evidence such as reduced strength, reduced sensation, or a reduced ability to complete postural movements, is not enough to discount subjective symptoms of pain caused by fibromyalgia."). In this case, the ALJ cited precisely this type of "objective evidence" in discrediting Plaintiff's symptom reports (AR 18). However, fibromyalgia is not a condition that can be diagnosed or ruled-out by "objective tests." *See Akin* 887 F. 3d at 318; citing *Vanprooyen v. Berryhill*, 864 F.3d. 567, 572 (7th Cir. 2017).

When reports of disabling pain are not fully supported by the "objective medical evidence," the ALJ must "investigate all avenues presented that relate to the pain." *See Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000) (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). The ALJ must "carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms." 20 C.F.R. 404.1529; SSR 16-3. The regulatory factors for evaluating symptom testimony include: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medications; any additional treatments an individual receives for relief of symptoms; any non-treatment measures taken to relieve symptoms; any other factors concerning an individual's functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c)(3).

Efforts a claimant has undergone to relieve pain are pertinent in evaluating symptom testimony under 20 C.F.R. § 404.1529 and SSR 16-3p. Instead of favorably considering Plaintiff's course of treatment, the ALJ asserted there was "little treatment" for the lumbar spine and hand pain and used this as a reason to discount the severity of Plaintiff's symptoms (AR

19-20). However, Plaintiff has undergone rather extensive treatment in the past for her impairments and pain, including a lumbar spine fusion at L5-S1 in 2008. (AR 493, 496-497, 509). *See Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018) (citing *Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016)) (That a claimant has undergone painful and risky procedures in attempts to alleviate pain would seem to support the credibility of claims regarding the severity of pain). When her pain returned, her surgeon did not recommend additional back surgery. (AR 536-538). She also had surgery on her feet and injections in the right foot (AR 485, 561-564, 555-558), injections in the wrists for bilateral carpal tunnel (AR 541-545), participated in pain management where she underwent injections, nerve blocks and was prescribed strong pain medications (AR 499-519, 550, 531-535, 550-554, 886-959) participated in physical therapy (AR 520-530), and underwent acupuncture treatment (AR 368-374). This course of treatment supports rather than detracts from symptom severity reports.

For her mental impairments, Plaintiff presented for regular appointments with Parkview Physicians Group (PPG) Psychiatric Care beginning in November 2014. (AR 672-677). During an intake session, Jay Fawver, M.D. diagnosed social anxiety disorder, generalized anxiety disorder, PTSD, major depressive episodes, moderate, and recurrent binge eating (AR 677). Dr. Fawver noted a long list of medications Plaintiff had tried including, Lyrica, Neurontin, Lamotrigine, Benadryl, Valium, Ambien/CR, Lunesta, Saphris, Latuda, Doxepin, Effexor/XR, Cymbalta, Savella, Fetzima, Prozac, Celexa, Lexapro, Paxil/CR, Zoloft, Vibyrd, Brintellix, Trazodone, and Wellbutrin. (AR 676). He prescribed Vortioxetine and Asenapine (AR 677). Plaintiff continued to have regular appointments at PPG Psychiatric Care. (AR 569-726, 846-869, 960-1031). The most recent visit in the record was from February 2019 when Plaintiff presented with mind racing,

difficulty focusing, sleep difficulties, irritability, and worrying; psychiatric medications were again adjusted. (AR 961-966).

Plaintiff also attended 22 psychotherapy sessions with Abigail Powers, Ph.D. from 2016 to 2017. (AR 390-399). Dr. Powers reported that Plaintiff was experiencing panic attacks and social anxiety (exhibited by restlessness and withdrawal), making it difficult for her to leave the house. (AR 390). Her physical symptoms included confusion and memory loss, headaches, nausea, pain associated with her back and fibromyalgia, and considerable fatigue. (AR 390). Dr. Powers opined that Plaintiff's physical symptoms would likely affect work-related activities such as sitting, standing, lifting or handling heavy objects, as well as activities requiring sustained focus and concentration. (AR 390).

Plaintiff also explained that the lack of recent treatment was due to inability to afford treatment, a factor that the ALJ did not address in considering the symptom testimony. Though the ALJ mentioned testimony about difficulty affording treatment, it is not apparent how or whether the ALJ considered the inability to afford more treatment in evaluating Plaintiff's symptom testimony. Prior to drawing a negative inference about a claimant's symptoms from a failure to obtain certain treatment, the ALJ must first consider any explanations that the individual may provide or other explanatory information in the case record. *See Craft*, 539 F.3d at 678-79 ("An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'").

Plaintiff argues that the ALJ also impermissibly discounted the severity of Plaintiff's symptoms by drawing her own, unsupported medical inference regarding her treatment. *See Myles*, 582 F.3d at 677 ("The ALJ decided, absent any medical evidence, that Myles's condition

was less serious because it was treated only with oral medication and not with insulin therapy."). Plaintiff points out that the ALJ failed to identify what treatment was lacking or what additional treatment would have enhanced the symptom reports. In addition, because the ALJ did not find fibromyalgia was a medically determinable impairment, she never considered the extent to which the hand, wrist, and back pain were related to the fibromyalgia. Thus, the ALJ was unable to formulate a reasoned opinion about whether Plaintiff engaged in the appropriate treatment measures to address her fibromyalgia pain.

Further, Plaintiff contends that the ALJ also failed to consider Plaintiff's work history as a "favorable" credibility factor in considering her symptom testimony. *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983)) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."); *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (criticizing ALJ for failing to consider claimant's "dogged efforts" to work in deciding claimant's credibility); *Flores v. Massanari,* 19 F. App'x 393, 404 (7th Cir. 2001)(criticizing ALJ for failing to acknowledge claimant's solid work history of 13 years). Plaintiff worked at the same job for 27 years, and her work ended because "[her] brain wasn't working right and [her] back couldn't handle it". (AR 42); on the last day she went to work, she had to be "wheeled out in a chair because [her] back hurt so severe [she] couldn't walk. (AR 42). Dr. Kaplansky also provided off-work notes in 2014 when he evaluated Plaintiff and diagnosed fibromyalgia (AR 356, 359). Plaintiff argues that the fact that she returned to work after her 2008 back surgery suggests she would have returned to work in 2014, if able.

Plaintiff claims that the ALJ's errors at step two (and the remainder of the decision) also

indicated the ALJ did not properly consider all of Plaintiff's impairments in combination, including the impact of fibromyalgia which the ALJ found was not even a medically determinable impairment. An ALJ is required to consider an individual's impairments in combination in assessing the ability to work, including impairments that alone may not be severe. *See* 20 C.F.R. § 404.1523(c). The Seventh Circuit has repeatedly indicated that an ALJ must consider the combined effect of the impairments and "even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling." *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

Plaintiff points out that in considering her subjective symptoms and formulating the RFC, the ALJ failed to even mention the third-party statements completed by Plaintiff's husband (Exhibit 5E), and her daughter (Ex. 9E) (AR 265-273, 301-315). SSA recognizes the importance of statements from family members. 20 C.F.R. § 404.1545(a)(3) (permitting claimant to submit "descriptions and observations" about her functional limitations from "family, neighbors, friends, or other persons"); SSR 16-3p (nonmedical sources such as family and friends may provide helpful information to assess the claimant's intensity, persistence, and limiting effects of symptoms and must be considered properly). SSR 12-2p also indicates that information from nonmedical sources can help evaluate the severity and functional effects of a person's fibromyalgia and "may help assess the person's ability to function day-to-day and over time" and in assessing the "credibility" about a person's symptoms and their effects. SSR 12-2p. III.A.2. Plaintiff notes that both third-party statements provided very detailed information about Plaintiff's daily living activities and her physical and mental limitations performing various activities and completing tasks, particularly due to her pain, discomfort, loss of focus and

concentration, and sleep difficulties (AR 265-273, 301-315). *See Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir. 1996) ("testimony from lay witnesses who see the claimant every day is of particular value[;] such lay witnesses will often be family members.").

In response, the Commissioner claims that "Plaintiff's focus on whether the ALJ's reasoning was 'good' obfuscates the relevant inquiry." However, an expectation of logical, or as the Commissioner calls it, "good" reasoning, is consistent with the substantial evidence standard under 24 U.S.C. § 405(g) and what is required for a legally sufficient evaluation of a claimant's symptoms under Social Security regulations and Rulings. *See* SSR 16-3p, 20 C.F.R. § 404.1529. Seventh Circuit case law also requires decisions, including "credibility" determinations, to be factually supported and based on logical inferences.

Plaintiff points out that in relying on a harmless error defense related to the evaluation of fibromyalgia, the Commissioner essentially admits the ALJ made a mistake at step two. The Commissioner has not explained how the ALJ could rationally evaluate Plaintiff's symptoms when the ALJ erred in finding that fibromyalgia was not a medically determinable impairment. Clearly, the ALJ's errors in evaluating Plaintiff's fibromyalgia resulted in factual and logical gaps related to the symptom evaluation and residual functional capacity assessment.

The Commissioner's response is largely a restatement of the objective findings and treatment course that the ALJ thought undermined the symptom reports. However, as discussed, it is not permissible for an ALJ to dismiss symptoms based only his or her perception of the objective medical evidence. *See Hill v. Colvin,* 807 F.3d 862, 869 (7th Cir. 2015); SSR 16-3p. The Commissioner has also failed to refute Plaintiff's arguments that the ALJ was unable to evaluate the severity of Plaintiff's symptoms. The Commissioner has not explained how the ALJ

could discern what symptoms would reasonably be expected in an individual with Plaintiff's impairments when the ALJ failed to consider the correct impairments.

Not only did the ALJ misapprehend what treatment and findings would be expected for individual with Plaintiff's medically determinable impairments, she also failed to articulate why the extensive treatment Plaintiff pursued did not support her symptom reports. The treatment Plaintiff underwent for her lumbar spine, including a lumbar spine fusion surgery and pain management with injections and strong pain medications, belie the ALJ's characterization of the record as demonstrating "little treatment" for the lumbar spine.

The Commissioner acknowledged that the ALJ failed to consider Plaintiff's work history and does not contest that Plaintiff has an excellent work history that weighs in favor of her symptom reports. Instead, the Commissioner responds that the ALJ was not "statutorily required to consider a claimant's work history." While an ALJ is not "statutorily mandated" to consider a claimant's work history, in this case Plaintiff's work history and efforts to work is at least arguably significant evidence that the ALJ should have considered.

As with the work history evidence, the Commissioner does not dispute that the ALJ failed to articulate whether or how she considered the third-party statements, nor does he contest that this evidence favored Plaintiff's symptom reports. Instead, \the Commissioner responds that this is just another category of evidence the ALJ was not required to address.

Thus, not only has the Commissioner failed to refute Plaintiff's argument about the ALJ's misapprehension of the significance of the medical evidence, but he has not explained how the ALJ could have considered the consistency (or lack thereof) of Plaintiff's symptom reports with the "other evidence in the record" when the ALJ failed to articulate how or whether she

considered multiple important lines of evidence, including the work history and third-party reports. Thus, remand is warranted on this issue, due to the unsupported RFC assessment.

Next, Plaintiff argues that the ALJ also erred in her consideration of the opinion evidence from Abigail Powers, PhD. ALJs are required to evaluate medical opinions consistent with 20 C.F.R. § 404.1520c(b). Failure to consider and explain consideration of an opinion warrants remand. *See, e.g., Clark v. Saul*, No. 1:20-CV-15- HAB, 2021 U.S. Dist. LEXIS 9482 (N.D. Ind. Jan. 19, 2021).

As noted above, Dr. Powers saw Plaintiff for 22 psychotherapy sessions between March 2017 and February 2017 (AR 390). The ALJ claimed that Dr. Powers was not "qualified to opine on the physical functioning of the claimant" (AR 21). Plaintiff argues that even non-medical professionals can render these types of opinions which can be very useful. Plaintiff points out that the ALJ never mentioned factors weighing in support of Dr. Powers's opinion, including that she personally observed and treated Plaintiff over the course of many sessions and that other medical evidence supported Plaintiff's symptoms (AR 390-399).

In response, the Commissioner claims the ALJ "reasonably found that Dr. Powers' vague assessment of unspecified functional limitations was not consistent with or supported by the record." However, over the course of 22 sessions spanning about one year, Dr. Powers observed that Plaintiff had panic attacks and social anxiety exhibited by restlessness and social withdrawal making it difficult to leave her home. (AR 390). Dr. Powers further noted that Plaintiff's symptoms included confusion and memory loss, headaches, nausea, and pain associated with her back and fibromyalgia along with considerable fatigue. Dr. Powers opined that Plaintiff's physical symptoms would likely affect work activities such as sitting, standing, lifting, or

handling heavy objects as well as activities requiring sustained focus and concentration. (AR 390).

As noted, the ALJ discounted the opinion of Dr. Powers because she was allegedly "not qualified to opine on the physical functioning of [Plaintiff]" and because Dr. Powers was "not specific in identifying how much the claimant's mental functioning would be affected by her impairments". (AR 21). While Dr. Powers' status as a psychologist is not a factor adding to the persuasiveness of her opinion, this does not *per se* make her unqualified to render an opinion concerning Plaintiff's physical limitations due to pain and fatigue. In this case, other factors added to the persuasiveness of the opinion, including that Dr. Powers personally observed Plaintiff over the course of 22 sessions and had an opportunity to observe her symptoms, including pain and fatigue, and to formulate a well-reasoned opinion about her functioning and limitations.

Plaintiff also correctly points out that if the ALJ was concerned that Dr. Powers did not adequately quantify Plaintiff's mental limitations, the ALJ could have sought clarification or asked Plaintiff's attorney to obtain clarification from Dr. Powers. Instead, the ALJ announced for the first time in the unfavorable decision that she found fault with Dr. Powers' opinion. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information"). As the ALJ erred in her consideration of Dr. Powers' opinion, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ erred in failing to incorporate limitations from

Plaintiff's combined impairments into the RFC assessment and in the corresponding hypothetical to the vocational expert. The RFC is an assessment of what work-related activities a claimant can perform despite her limitations. *Young*, 362 F.3d at 1000; *see also* 20 C.F.R. § 404.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3)). In assessing RFC, the ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. SSR 96-8p.

Here, the ALJ found Plaintiff could perform work at the light exertional level, which requires lifting up to 20 pounds occasionally, and 10 pounds frequently and standing/walking at least 6 hours in an hour day. Plaintiff points out that medical records indicate that Plaintiff's symptoms were aggravated by sitting, standing, leaning forward, walking, lying on her side, lying on her stomach, driving, coughing/sneezing and relieved by lying on her back (AR 357). The evidence also demonstrates that Plaintiff had "good days" and "bad days" associated with her fibromyalgia. In July 2014, Dr. Kaplansky took Plaintiff off work when she presented for evaluation of her back pain and fibromyalgia (AR 356). Dr. Powers opined that anxiety and panic made it difficult for Plaintiff to leave her home and that her physical symptoms, including pain and considerable fatigue associated would likely affect work activities such as sitting, standing, lifting, or handling heavy objects as well as activities requiring sustained focus and concentration (AR 390). Plaintiff also notes that the symptom reports from Plaintiff and her family members demonstrate an inability to sustain full-time work due to pain and fatigue.

Plaintiff maintains that the ALJ's focus on tasks Plaintiff might be able to perform intermittently does not comply with the requirement to determine whether she is able to perform a significant number of full-time jobs on a regular and continuing basis. *See* POMS DI 24510.057, Sustainability and the Residual Functional Capacity (RFC) Assessment ("REMINDER: Inability to sustain a 40-hour workweek is an RFC finding." (emphasis in original)). Moreover, the fact that some of Plaintiff's "mental" limitations are attributable to pain or physical causes is also not relevant. *See* POMS DI 24510.006 ("Likewise, even though mental impairments usually affect nonexertional functions, they may also limit exertional capacity by affecting one or more of the seven strength demands. For example, a mental impairment may cause fatigue or hysterical paralysis.").

Plaintiff claims that the ALJ's mental RFC assessment was also inconsistent with the weight assigned to the opinion of the DDB examining psychologist, Dr. Predina, and the state agency psychological consultants. Dr. Predina opined that Plaintiff would likely struggle to get along with supervisors and co-workers due to her mental health issues. (AR 118, 135, 832). The state agency psychological consultants also determined that Plaintiff was moderately limited in interacting with others under the "B" criteria. (AR 112-113, 117-118, 129, 134-135).

The ALJ found the medical opinion of Dr. Predina and the state agency evaluators were "persuasive". (AR 21). Despite this, the ALJ found that Plaintiff could have frequent interaction with supervisors (apart from what is necessary for general instructions, task completion, or training), co-workers, and the general public. (AR 17). Providing that Plaintiff could have "frequent interaction" means that she would be expected to maintain social interaction for up to 2/3 of the workday which translates into about 277 minutes or 4.62 hours each day, excluding

normal breaks of 30-minute for lunch and two 15-minute breaks. (7 hours per day x 60 minutes x 2/3=227.2 minutes/day). Thus, it is not apparent whether or how supervisor interaction would even be limited. Plaintiff notes that the ALJ also failed to reconcile the RFC with the weight she afforded to the opinions of the state agency psychologist who opined that Plaintiff was moderately limited in interacting with the general public, and with the opinion of Dr. Predina who opined that Plaintiff would struggle to get along with supervisors and co-workers due to her mental health issues. (AR 832).

The vocational witness acknowledged if an employee was unable to interact with supervisors for up to one-third of the day, that would be work-preclusive (AR 73-74). The vocational witness also testified that to keep any of the jobs she identified, a worker could at most be "off task" 10% of the workday and should not accumulate more than 12 absences in a year (AR 70). In addition, no competitive work would allow for a worker to take breaks in a recumbent position which were the type of breaks Plaintiff testified she needed to relieve her pain (AR 74-75).

Plaintiff concludes that because the RFC assessment and corresponding hypothetical were flawed and did not account for all of Plaintiff's limitations, the ALJ's step five finding is not supported by substantial evidence. *See Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). The Commissioner has failed to refute Plaintiff's arguments concerning the ALJ's errors in formulating Plaintiff's RFC. For the reasons discussed above, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ's application of the SSA's borderline age rules should be revisited due to the ALJ's errors in formulating the RFC. In this case, Plaintiff attained age 55 in March 2020. The ALJ issued her decision on October 30, 2019, which was less than six

months prior to Plaintiff transitioning to the "advanced age" category. (AR 23). She was last insured for disability benefits as of December 31, 2019, about three months before switching age categories (AR 13). The SSA has promulgated regulations to govern application of the age categories "in a borderline situation." 20 C.F.R. § 404.1563. The rules require ALJs to decide whether to use the older age category after evaluating the overall impact of all the factors of the claimant's case where the claimant is within a few days to a few months of reaching an older age category and using the older age category would result in a determination or decision that the claimant is disabled. *Id*. Here, the ALJ correctly noted that a "borderline age situation" exists requiring consideration of whether to apply the higher or lower age category (AR 22).

The HALLEX, which is SSA's manual that provides "guiding principles and procedures", states "[t]he ALJs will explain that he or she considered the borderline age situation, state whether he or she applied the higher age category or chronological age, and note the specific factor(s) he or she considered." HALLEX I-2-2-42.C.5 (Borderline Age). Circuit Courts are divided regarding the level of articulation required in borderline age situation, and the Seventh Circuit has not discussed in detail the duty to articulate consideration of a borderline age situation. *See Ross v. Berryhill*, 385 F. Supp. 3d 767, 775 (W.D. Wis. May 9, 2019) (collecting cases). Yet, numerous courts within the Seventh Circuit have held that ALJs are required to explain their age category determination. *See Wenzel v. Colvin*, (collecting cases); *see also Figueroa v. Astrue*, 848 F. Supp. 2d 894, 900-01 (N.D. Ill. 2012) (collecting cases). As the court noted in *Pelech v. Colvin*, the Seventh Circuit has long held that an ALJ must build a logical bridge between the evidence and their conclusions so as to permit meaningful review; this includes articulation in borderline age situations. *See Pelech v. Colvin*, No. 14 C 7021, 2016 U.S.

Dist. LEXIS 21215, at *23, 2016 WL 727208 (N.D. Ill. Feb. 22, 2016).

Education, work experience, and RFC are factors ALJs need to consider in borderline age situations. *See* POMS. 25015.006 E.1. Although there were mental restrictions in the RFC eroding the light occupational base, the ALJ did not articulate how or whether she considered the RFC as a vocational adversity. In addition, because the ALJ erred in formulating the RFC, there is no assurance she properly considered the borderline age situation.

The Commissioner asserts the ALJ properly applied the borderline age rules by considering Plaintiff's work history and education. Yet, the Commissioner does not refute Plaintiff's argument that the ALJ failed to consider the various non-exertional limitations as vocational adversities. Thus, on remand, the ALJ should re-evaluate the application of the borderline age rules.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: July 6, 2021.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court